Filed 8/27/14  In re J. T. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J. T., a Person Coming Under the Juvenile Court Law. | B251269 |
| | (Los Angeles County Super. Ct. No. CK99797) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| GERALD S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Carlos E. Vazquez, Judge.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance on behalf of Plaintiff and Respondent.

Gerald S. (Gerald) appeals from orders of the juvenile court. (Welf. & Inst. Code §§ 358, 360, 395.)[1] Gerald challenges the juvenile court's denial of his request for presumed father status as to J. T. (J. ), born June 2010. Gerald contends that his due process and statutory rights to notice were violated because he was never provided with notice of the detention hearing where Emmanuel C. was declared the presumed father of J. . Gerald also contends that substantial evidence does not support such a finding, and requests that the matter be remanded for a jurisdictional hearing.

The Department of Children and Family Services (DCFS) did not request that the court find Emanuel C. to be the child's presumed father, nor did DCFS request that Gerald be named the presumed father. Therefore, DCFS takes no position as to appellant's appeal.

We find no error and affirm the juvenile court's orders.

### FACTUAL AND PROCEDURAL BACKGROUND

**Family information**

Jasmyn T. (mother) is the mother of two children, three-year-old J. , and five-month old M. W., who is the half-sibling of J. . Upon J. 's birth, Emanuel C. signed a voluntary declaration of paternity (VDP) and was named as the natural father on J. 's birth certificate. Emanuel C. alleged that J. lived with him from June 24, 2010 to August 2010. Gerald alleged at first that he knew he was J. 's biological father, but later stated he was unsure. Gerald also reported that although he did not have full custody of J. , the child lived with him from June 10, 2010 to June 12, 2012, and whenever mother's housing situation was unstable. He alleged that he had been the child's paternal figure.

At the time of the incident leading to the current referral, M.'s biological father was mother's male companion.[2]

**Prior history with DCFS**

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]    Mother, Emanuel C., Maryiah, and Maryiah's father are not parties to this appeal.

2

DCFS received a referral on November 20, 2012, alleging that mother was smoking marijuana inside the home while J. was inside. The referral was closed as unfounded for emotional abuse and inconclusive for general neglect of J. . Allegations of emotional abuse and general neglect of J. by M.'s father were reported on November 21, 2012. The allegations were that he climbed into their home, grabbed mother while J. was in her arms, and pushed her against a wall. This referral was closed as inconclusive.

On March 28, 2013, DCFS received a referral alleging physical and emotional abuse of M. when mother and M.'s father got into an altercation and tossed M. into the back seat of the car. Although the allegations of physical abuse were deemed unfounded, the allegations of emotional abuse were under investigation when the current referral was generated.

**Section 300 petition and detention**

On May 24, 2013, mother engaged in another violent altercation with M.'s father in the presence of J. and M. Mother was arrested for burglary and inflicting corporal injury on former cohabitant. M.'s father was granted a temporary restraining order protecting himself and M. from mother. Police notified Gerald of mother's arrest and initially requested that he collect J. . However, police called again to inform Gerald that J. was actually released to maternal aunt April C. Gerald attempted to call April C. several times but she was not available and did not return his calls. Mother was released from custody on May 30, 2013.

On June 4, 2013, DCFS filed a dependency petition under section 300, subdivisions (a) and (b) asserting substantial risk of serious physical harm and a failure to adequately protect J. . The dependency petition listed Gerald as the presumed father of J. . Prior to the detention hearing, the whereabouts of mother and J. were unknown, however DCFS received information that mother had threatened to move to Las Vegas, Nevada with her children.

DCFS telephoned mother on June 3, 2013, to notify her of the date, time and location of the detention hearing. Mother indicated that she would be attending the hearing with J. . DCFS also telephoned Gerald on June 3, 2013, and left a message on his

3

answering machine detailing the hearing date, time, place, and a call-back number, but received no response.

Mother was present and appointed counsel at the June 4, 2013 detention hearing. Counsel was also appointed on behalf of the alleged father, Emanuel C., who resided in Las Vegas, Nevada. The court found notice was properly given, despite Gerald's absence.

Emanuel C.'s appointed counsel requested that Emanuel C. be named the presumed father of J. . Although he was not present at the hearing, counsel represented that Emanuel C. was willing to sign and submit the JV-505 form to the court. Counsel also stated that Emanuel C.'s name appeared on J. 's birth certificate, which Emanuel C. signed on the day or the day after J. was born. Based on this information, the juvenile court found Emanuel C. to be the presumed father of J. .

DCFS sought detention of J. from mother based on the incident of domestic violence on May 24, 2013, when the temporary restraining order was issued to M.'s father. Mother's counsel requested that the court not detain her children, and to coordinate visitation with the respective fathers. Because the facts listed in the detention report do not expressly state that the children were present during the domestic violence incident, and the social worker did not find J. to be in a state of abuse or neglect during her evaluation, mother's counsel argued that the children should remain released to mother's care. Furthermore, mother's counsel informed the court that if necessary, mother was willing to refrain from contact with M.'s father, and pointed to family support to ensure mother did not engage in inappropriate behavior. Her counsel also requested that if the court chose to detain J. , all potential related or nonrelated extended family members be evaluated for placement, and that mother be granted some form of unsupervised visitation. Emanuel C.'s counsel requested full custody of J. if the court detained the child. Because Emanuel C. was living in Las Vegas, Nevada with an aunt and his two adult children, his counsel also asked that the court promptly conduct any necessary housing assessment so that J. could be placed without foster care involvement.

4

At the June 4, 2013 detention hearing, the juvenile court found a prima facie case for detaining J. from mother, based on section 300, subdivisions (a) through (j). The court vested J. 's custody and control with DCFS, pending a further jurisdictional and dispositional hearing. The court ordered monitored visits with mother at the DCFS office or approved location, while relatives were evaluated for placement. Finally, the court ordered that Emanuel C.'s home be assessed to determine whether the home was suitable for placement of J. pending the jurisdictional hearing.

**Jurisdictional and dispositional report**

The jurisdictional/dispositional report, filed July 31, 2013, detailed prior DCFS referrals and criminal histories of mother and Gerald. Mother's criminal history included a dismissed charge of obstructing a public officer in 2007, a misdemeanor conviction for loitering with intent of prostitution in 2007, and a dismissed robbery conviction in 2008. Gerald's criminal history included a felony conviction for transporting and selling narcotics and controlled substances in 2007, a dismissed domestic violence charge in 2009, and a second felony conviction for the manufacture and possession of a dangerous weapon in 2010.

The report quoted Gerald, "'I know that I am the father of J. but when the social worker told [mother] that J. was going to stay with me [mother] started telling the social worker that I was not her father.'" Gerald also stated that he had taken care of J. since birth, and mother told both of their families that J. was his daughter. In an interview concerning a prior DCFS referral, Gerald invited the worker into his one-bedroom apartment to show the worker the convertible couch where J. slept, and the food, water, clothes, toys, and other basic life necessities that he provided for J. . Gerald said he "never had any concerns about [mother] harming the children." But because mother did not have a stable home at the time, he planned on asking mother to allow J. to stay with him, and was willing to ask for full custody.

Based on its investigative findings to date, DCFS suggested that continued detention from the care of mother was in the best interest of J. , and recommended that mother receive family reunification services. DCFS cited mother's underlying domestic

5

violence issues and the continuing turmoil in her relationship with M.'s father. As to Gerald's interest in receiving family reunification services for J. , DCFS recommended DNA testing prior to any dispositional findings, as Gerald had represented to DCFS that he was "unsure" if he was the father of J. . DCFS further recommended that J. remain placed and that family reunification services be provided to mother and Gerald.

**Statements regarding parentage**

On August 7, 2013, Emanuel C. filed a JV-505 "Statement Regarding Parentage" which indicated that he had already established parentage by signing a VDP on June 24 or 25, 2010. In the form it was stated that J. lived with Emanuel C. from birth to August 2010. Emanuel C. declared that he participated in childcare activities expected of a father, including feeding, playing with J. , and extracurricular activities; he provided "financial support . . . to the best of [his] abilities," such as necessities, clothes, and shoes; and he told family, friends, and the world at large that J. was his child.

Gerald filed a JV-505 statement regarding parentage on August 9, 2013, stating that J. had lived with him from June 10, 2010 to June 12, 2012. He declared that he provided her with "toys, food, love, care, support, clothes, [and] shelter." He stated that he participated in all parenting activities, such as going to parks and playgrounds, walking the beach, and "school on TV." Gerald also stated that he told family, the social worker, and courts that J. was his child.

**Jurisdictional and dispositional hearing**

Both Gerald and Emanuel C. appeared at the jurisdictional/dispositional hearing on August 8, 2013. Gerald's counsel challenged the court's previous finding that Emanuel C. was the presumed father of J. , seeking presumed father status for Gerald and an HLA test to establish paternity. Emanuel C. argued that he had submitted the VDP, which according to Family Code sections 7571 and 7573, had the same force and effect as a judgment of paternity issued by the court. Neither mother nor father rescinded this declaration within the 60-day limitation, thus it remained valid. Additionally, Family Code sections 7575, subdivision (3)(a) and 7646, subdivision (a)(2) require the notice of motion for genetic tests be filed within two years of the child's birth. Emanuel C. argued

6

that because the child is three years old, Gerald's challenge to the presumed father status is moot. Though, as Emanuel C. suggested, Gerald could conduct an HLA test on his own and present that to the court at a later time. Both mother and DCFS were opposed to the court authorizing the HLA test. The court declined to order the test, particularly due to the fact that the child was over the age of two.

Mother submitted to the jurisdiction of the juvenile court under section 300, subdivision (b)(1). The court dismissed the section 300, subdivision (a)(1) count, but found by a preponderance of the evidence that the section 300, subdivision (b)(1) count of the petition was true as amended. The court ordered the child removed from the custody of mother due to substantial danger to J. 's physical and emotional health if she were to be returned.

With regard to the disposition of J. , counsel for Emanuel C. relied on section 361.2 saying "[that for] a nonoffending, non-custodial parent who steps up and requests return of the child, the child shall be placed with the parent unless it finds placement with that parent would be detrimental to the safety and protection of the child." Emanuel C. requested that since there was no detriment in placing J. with him, the court grant him custody, allowing mother reunification services. Mother agreed to placement with Emanuel C., however DCFS objected on the grounds that the placement was detrimental because Emanuel C. should have stopped the serious domestic violence incident or reported it to authorities. The court declared J. a dependent of the court and placed her with Emanuel C., allowing enhancement services for mother and DCFS monitored visitation.

The juvenile court ordered a six-month review proceeding for February 6, 2014. Gerald appealed from the juvenile court's August 8, 2013 orders the same day.

**DISCUSSION**

Dependency appeals are governed by section 395, which provides: "A judgment in a [dependency] proceeding . . . may be appealed from in the same manner as any final judgment. . . ." (*Joe B. v. Superior Court* (2002) 99 Cal.App.4th 23, 26.) Hence, the detention and jurisdictional findings are appealable from the dispositional judgment.

7

Juvenile courts have the authority to make a finding of paternity as to a child regarding whom a petition has been filed under section 300. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 441, fn. 4.) The Uniform Parentage Act of 1973 (UPA) (Fam. Code, § 7600 et seq.) provides the statutory framework for determinations of parentage, distinguishing between biological, alleged, and presumed fathers. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050.) "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status." (*In re Zacharia D., supra*, at p. 449, fn. 15.) A man who may be the father of the child, but has not established biological paternity, nor has achieved presumed father status, is an alleged father. (*Ibid.*) Presumed father status entitles a man to greater parental rights than biological and alleged fathers, including the right to custody of a child. (*Ibid.*; *J.R. v. D.P* (2012) 212 Cal.App.4th 374, 383.) A man may qualify for presumed father status under any of the presumptions set forth in Family Code section 7611, including:

1. He "meets the conditions provided in Chapter 1 (commencing with [Family Code] section 7540)" -- he is married to and cohabitating with the child's mother.

2. He "meets the conditions provided in . . . Chapter 3 (commencing with [Family Code] section 7570)" -- he has executed a voluntary declaration of paternity.

3. He "meets the conditions . . . in any of the following subdivisions: [¶] . . . [¶] (d) The presumed parent receives the child into [his] home and openly holds out the child as [his] natural child." Gerald bases his paternity claim on this last presumption.

Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, there "'can only be one presumed father.'" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603.) If two or more conflicting paternity presumptions arise under Family Code section 7611, "'the presumption which on the facts is founded on the weightier considerations of policy and logic controls.' [Citation.]" (*J.R. v. D.P., supra*, 212 Cal.App.4th at p. 383; Fam. Code, § 7612, subd. (b).)

## I. Standard of review

Appellate courts review presumed parentage determinations under the substantial evidence standard. (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.) We also review issues

of notice for substantial evidence.  (*In re Emily R.* (2000) 80 Cal.App.4th 1344, 1354.)
The term "substantial evidence" means such evidence that a reasonable mind would
accept as adequate to support a conclusion.  (*In re Jerry M.* (1997) 59 Cal.App.4th 289,
298.)  We view the facts "most favorably to the judgment, drawing all reasonable
inferences and resolving all conflicts in favor of the order.  [Citation.]"  (*In re Spencer W.*
(1996) 48 Cal.App.4th 1647, 1650 (*Spencer W.*).)  We are precluded from reweighing the
evidence, evaluating the credibility of witnesses, or resolving evidentiary conflicts,
instead examining the entire record to determine whether a reasonable trier of fact could
have found as it did.  (*Ibid.*)  The appellant has the burden of showing that there is no
evidence of a sufficiently substantial nature to support the finding or order.  (*In re Dakota
H.* (2005) 132 Cal.App.4th 212, 228.)

## II.  Substantial evidence supported the juvenile court's presumed father findings

To the extent Gerald contends the juvenile court erred in finding that he was not J.
's presumed father, we disagree.  According to Family Code section 7571, subdivision
(a), a man is presumed to be the natural parent of the child when, upon birth, the natural
father identified by the natural mother signs a VDP.  This completed VDP establishes the
paternity of a child and has the same force and effect as a judgment for paternity issued
by a court.  (*In re Levi H.* (2011) 197 Cal.App.4th 1279, 1287.)  It is recognized as the
basis for establishing an order for child custody and family reunification services.  (*In re
Jerry P.* (2002) 95 Cal.App.4th 793, 801.)

Emanuel C.'s claim to presumed father status was based on two documents:  (1) J.
's birth certificate, and (2) the VDP signed at J. 's birth.  Gerald asserts that because
neither the birth certificate nor the VDP were ever actually produced to the court, they
were merely second-hand evidence, and the juvenile court lacked the requisite substantial
evidence when naming Emanuel C. the presumed father.  Gerald refers to *In re A.A.*
(2003) 114 Cal.App.4th 771 (*A.A.*), contending that counsel's statements regarding a
conversation with Emanuel C. and what Emanuel C. said were not evidence, but "second-
hand hearsay argument" or less.  (See *A.A., supra*, at p. 787.)  The *A.A.* court rejected
counsel's representations because they were made in points and authorities, not in a

9

signed declaration. But here, Emanuel C.'s JV-505 form was a signed declaration attesting that he submitted the VDP and therefore was of a sufficiently substantial nature to support the court's finding. Additionally, mother declared at the dispositional hearing that Emanuel C. was actually the biological father who she wanted to remain the presumed father of J. . Taken together, the statements of Emanuel C. and mother could reasonably support such a finding by a trier of fact and thus meet the substantial evidence threshold required for a presumed parentage determination.

Gerald also asserts that the purported VDP was invalid because the record does not provide proof that it complied with Family Code section 7571, subdivision (a), which requires that hospital staff "'witness the signatures of parents signing a [VDP] and . . . forward the signed declaration to Department of Child Support Services. . . . 'This statute imposes an official duty on hospital staff to forward signed voluntary declarations of paternity for filing.'" (*In re Levi H., supra*, 197 Cal.App.4th at pp. 1287-1288, italics omitted.) Pursuant to Evidence Code section 664, Emanuel C. was entitled to rely upon the presumption that the document was properly filed. Accordingly, the objecting party has the burden of showing that the VDP was not properly filed with DCFS. (*In re Levi H., supra*, at pp. 1287-1288.) Here, beyond merely questioning the document's existence, Gerald did not present any evidence to establish that the VDP was not filed with DCFS, and therefore cannot meet the burden necessary to overcome the presumption.

Moreover, Gerald contends that even if Emanuel C. signed a validly executed VDP, the juvenile court must apply a weighing analysis because Gerald too established the presumed parentage presumption by receiving the child into his home and openly holding the child as his natural child. (Fam. Code, § 7612, subd. (b).) This was evidenced in Gerald's JV-505 statement regarding parentage, where he declared that J. had lived with him from June 10, 2010 to June 12, 2012, during which time he had established a familial relationship with J. . Gerald declared that he provided her with "toys, food, love, care, support, clothes, [and] shelter." He stated that he participated in all parenting activities, such as going to parks and playgrounds, walking on the beach,

10

and "school on TV." Gerald claimed that he told family, the social worker, and courts that J. was his child.

Although the evidence may be sufficient to establish the Family Code section 7611, subdivision (d) presumption, the court has discretion to balance Gerald's interests against the Family Code section 7570 presumption asserted by Emanuel C.

The court in in *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119 (*Kevin Q.*), was also presented with competing paternity presumptions: a man who had signed a VDP for the child, and another man who, like Gerald, fell within the definition of presumed father under Family Code section 7611, subdivision (d). (*Kevin Q., supra*, at p. 1141.) Ultimately, the appellate court refused to apply the weighing process adopted by some courts because declarations of paternity are expressly excluded from the rebuttable presumptions listed under Family Code section 7612, subdivision (a). (*Kevin Q.*, at pp. 1137-1138.) Because courts may not add provisions to a statute, the court determined that the VDP had the force and effect of a paternity judgment, which superseded the competing Family Code section 7611, subdivision (d) presumption. (*Kevin Q.*, at pp. 1137-1138; see *In re Levi H., supra,* 197 Cal.App.4th at p. 1290 [finding that a man's VDP trumped presumed father status under Family Code section 7611, subdivision (d), despite any inequities].) Given the authority of *Kevin Q.*, the juvenile court here properly determined that Emanuel C.'s VDP, which has the force and effect of a judgment, could extinguish Gerald's presumption, leaving no conflicting presumptions subject to the weighing process. This narrow reading of the established rebuttable presumptions sufficiently supported the juvenile court's finding that Emanuel C. is the presumed father.

In his brief filed January 13, 2014, Gerald relies on *In re Brianna M.*, review granted February 11, 2014, S214955. Since our Supreme Court granted review of this case, we will not address those arguments other than to note that the facts here to do not rise to the level of a long-standing, stable parental relationship between Gerald and J. which could arguably warrant consideration in determining parentage. (Cal. Rules of Court, rule 8.1115)

11

Gerald contends that Emanuel C. did not establish a parent-child relationship, criticizing the sincerity of various statements made in his JV-505 form. But Emanuel C. need not establish the parent-child relationship required of Gerald because the VDP already proved Emanuel C.'s biological paternity, and likewise is sufficient to support the court's presumed father finding. There is no indication that declaring Gerald the presumed father is plainly in the child's best interest, and hence the juvenile court did not err in attributing greater weight to biological paternity in the instant case.

Gerald argues that he also qualified for presumed father status as an "equitable father" under the two-prong analysis in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*). *Kelsey S.* is an adoption case where the biological father did not meet the statutory presumed father requirements because he could not prove that he had taken the child into his home. Under the adoption statutes, only statutorily presumed fathers had authority to consent (or withhold consent) to the adoption of their children, hence the biological father was entirely excluded from the mother's decision to release their child for adoption. (*Ibid.*) The Supreme Court concluded that the adoption statutes violated the biological fathers' rights to due process and equal protection of the law to the extent that they permit the mother to unilaterally preclude her child's biological father from being a presumed father. (*Id.* at 849.)

Under the *Kelsey S.* analysis Gerald must prove that (1) mother unilaterally precluded him from achieving presumed father status, and (2) he had an existing familial relationship with the child such that his rights deserve the same level of protection as those of the biological mother. (*In re D.M.* (2012) 210 Cal.App.4th 541, 554.) Gerald's claims of implicit fraud are not reflected in the record beyond his own suspicion that mother was tactically shuffling J. between Gerald and Emanuel C. The fact that mother had formerly asked Gerald to take care of J. and later requested that Emanuel C. remain the child's presumed father, are not irreconcilable. Nor do these facts illustrate an attempt to unilaterally preclude Gerald from achieving presumed father status. The record does not indicate that Gerald took steps to gain full custody of the child, besides mentioning to the social worker that he was "willing." DCFS allegedly received

12

information that mother threatened to move to Las Vegas with J. , however she never actually moved. The mere threat of moving, which was not detailed in the record, hardly thwarted Gerald's ability to achieve presumed father status. While Gerald may have developed some sort of parent-child relationship when J. sporadically lived with him over a two-year period, Gerald's argument still fails under the first prong of the test.

In sum, the juvenile court reasonably concluded that the VDP signed by Emanuel C. renders him the presumed father of J. . This court may only determine whether a reasonable trier of fact could have found this to be true. (*Spencer W., supra*, 48 Cal.App.4th at p. 1650.) It may not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*Ibid.*)

## III. Notice of the detention hearing was proper

Gerald argues that his due process and statutory rights to notice were violated because he did not receive proper notice of the detention hearing. Under section 290.1, subdivision (a)(2), a social worker who files a dependency petition must promptly serve notice of the hearing to the father or fathers, presumed and alleged. Dependency proceedings often commence on an emergency basis with a detention hearing, thus oral or written notice can be sufficient. (*Kern County Department of Human Services v. Superior Court* (2010) 187 Cal.App.4th 302, 308.) Actual notice does not require actual receipt or actual knowledge; notice by means reasonably calculated to provide the notice is sufficient. (*In re Emily R.* (2000) 80 Cal.App.4th 1344; see *Tulsa Professional Collection Services, Inc. v. Pope* (1988) 485 U.S. 478, 490-491.) "Due process for an alleged father requires only that he receive notice and an opportunity to appear and assert a position and attempt to change his paternity status." (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.)

Gerald claims that there was no indication that he received notice of the detention hearing. On the contrary, there was no indication that he *did not* receive notice. Here, the record indicates that the social worker telephoned Gerald on June 3, 2013, to orally inform him of the detention hearing. The worker left a detailed message on his telephone answering machine containing the date, time, and place of the detention hearing.

Because this telephone call and message demonstrated an oral attempt to serve notice, there was no due process violation even if Gerald did not have actual knowledge of the detention hearing. Furthermore, mother and another party to the case were also telephoned by DCFS that same day, and both attended the detention hearing. It is unlikely that DCFS failed to provide notice of the hearing to one of three parties notified in the same manner on the same date. Therefore, the evidence supports the juvenile court's finding of proper notice for the June 4, 2013 hearing.

## DISPOSITION

The orders of the juvenile court are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

14